# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **ELTRED BOND,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:17-cv-00014-TES** |
| **GEORGIA POWER COMPANY,** | |
| *Defendant.* | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Eltred Bond claims that his former employer, Defendant Georgia Power Company, discriminated against him because of his race. Plaintiff brought claims against Georgia Power under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Defendant seeks summary judgment contending that all claims raised by Plaintiff are both legally and factually deficient, and as a result, no genuine dispute of material fact exists to be tried on this case. For the reasons set forth below, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 15].

## FACTUAL BACKGROUND

Georgia Power hired Bond as a Truck Operator on January 14, 2013. [Doc. 17, at 59:2-9]. The Truck Operator position is an entry level, probationary position covered under the Collective Bargaining Agreement with the International Brotherhood of Electrical Workers Union, Local 84. [Doc. 15-3, at 148; ¶ 4]. Truck Operators are part of a

statewide, traveling construction crew responsible for assisting linemen and other Georgia Power employees in constructing new and replacing existing transmission lines. [*Id*. at 149; ¶ 6].

Upon his hire, Bond completed orientation at Georgia Power's training facility and began job training throughout his assignment to his traveling construction crew. [Doc. 17, at 71:7-9]; *see also* [Doc. 15-3, at 148; ¶ 6]. Although clearly qualified for his job, Bond, from the outset, frequently retrieved the incorrect tools and struggled with tying knots and "barreling armour [sic] rods," all of which were integral parts of Bond's duties as a Truck Operator. [Doc. 15-3, at 149; ¶¶ 9, 10, 11]. When compared to other entry level Truck Operators who typically barrel rods within five minutes, Bond took almost 40 minutes. [*Id*. at 150; ¶ 14]. Despite more experienced Georgia Power employees' attempts to help Bond, he refused their help. [*Id*. at 150; ¶ 11]. For example, Nick Tinsley, Bond's direct supervisor, witnessed Bond's lack of initiative to improve his knot tying skills, and in response, cut Bond a piece of rope for practice. [*Id*. at 150; ¶ 10]. After telling Bond to practice with the rope, Tinsley later saw Bond leave the rope at their work site rather than take the rope with him to practice. [*Id*.]. This, along with Bond's desire to "bid out" to other positions within Georgia Power, displayed to Tinsley, "a lack of initiative and drive required of an entry level truck Operator." [*Id*.]; *see also* [Doc. 15-3, at 150; ¶ 12].

On March 19, 2013, while installing spacers on three phase transmission lines, an incident occurred. *See* [Doc. 17, at 110:12–112:5]. In order to install spacers on a

transmission line, a lineman must work from a transmission cart approximately 90 feet above the ground. [Doc. 15-3, at 151; ¶ 16]; *see also* [*id.*, at 157; ¶ 9]. The transmission cart moves along the wire by pulling it with a rope attached from the transmission cart to an all-terrain vehicle ("ATV"). [*Id.*]. While driving an ATV with a rope attached to Lineman Chuck Raper's transmission cart, Bond drove across a creek at an abrupt and accelerated rate of speed. [*Id.*]; *see also* [Doc. 17, at 113:19-22]. This burst of speed caused Raper's cart to travel suddenly down the line, nearly throwing Raper from the transmission cart. [Doc. 15-3, at 151; ¶16]; *see also* [*id.*, at 157; ¶ 9]. Although Bond did not hear Raper's yells, Raper yelled at Bond because he was allegedly going too fast. [Doc. 17, at 115:19–116:3]. Clearly upset by the incident, and after Bond explained to Raper that he did not hear him yell anything, Raper replied, "[I]f [I] had had a gun [I] would have shot [you]." [*Id.* at 118:15-19]. When discussing the incident with Jody Tillman, another Georgia Power employee, Tillman told Bond "if [you] were pulling [me] that fast [I] would have thrown a wrench and hit [you] in the head." [*Id.* at 118:6-14]. Following this incident, Bond never acknowledged making a mistake or apologized to Raper or Tinsley for the way he pulled the transmission cart. [*Id.* at 120:15–121:2].

The next day, Tinsley, reported the incident to Transmission Line Construction Manager, Ben Webb. [Doc. 15-3, at 152; ¶ 19, 155; ¶ 3]. Shortly thereafter, Webb consulted with two other members of Georgia Power's management, and they ultimately decided to terminate Bond based on his work performance, probationary status, and his lack of

understanding regarding safety protocols. [*Id*. at 157; ¶ 10]; [*id*. at 152; ¶ 19]. Consequently, Plaintiff filed suit.

In support of his claims, Bond contends that three co-workers made racial comments relating to his employment and work ethic. [Doc. 1, at ¶¶ 9, 10]. Bond claims that fellow entry level Truck Operator, Justin McAllister, stated that, "the company's not going to fire you because you're black." [Doc. 17, at 143:19-22]. Additionally, McAllister allegedly stated that, "[I] ha[ve] to work ten times harder than [you] because [you are] black." [*Id*. at 143:23–144:2]. On another occasion, Bond asserts that he overheard co-worker, Tillman say, "the only reason you got hired is because you are black." [*Id*. at 143:15-18]. Next, Bond asserts that DJ Ray's comment, "two out of three is not bad" when referring to the "three new hires" (Bond, McAllister, and Satcher) was an indication that Bond was "not doing a good job." [*Id*. 148:4-25]. Finally, Plaintiff alleges that "[the crew] lied about how [Bond] did [his] job" to Tinsley and presumably upper management. [*Id*. at 149:13-20]. However, when questioned about these alleged lies in regards to his work ethic Bond believes he "did a great job" and that his performance as a Truck Operator "went above and beyond what they asked." [Doc. 17, at 141:24–142:1].

As for opportunities as a Truck Operator, Bond alleges that his fellow entry level Truck Operators (Justin McAllister and Jay Satcher) received unwarranted training opportunities that he did not. [*Id*. at 130:15-22]. In essence, Bond contends that neither he, McAllister, nor Satcher should have been driving certain vehicles without proper training

or a commercial driver's license. Moreover, Bond complains that his fellow entry level co-workers drove certain commercial vehicles in violation of Georgia Power's policy. [*Id*.]; *see also* [*id*. at 129:23-25]. Lastly, Bond alleges that certain discriminatory acts extended to off-duty social activities. However, Bond states that "some nights [he] participated" and "some nights [he] didn't." [*Id*. at 133:5-15]. The foregoing facts encompass Bond's claims against Georgia Power. In making its ruling, the Court examines each instance and its relation to federal law, in turn below.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In determining whether a genuine dispute of material fact exists to defeat a motion for summary judgment, "the evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (internal quotation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it is relevant or necessary

to the outcome of the suit. *Anderson*, 477 U.S. at 248. A factual dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

The burden then "shifts to the [nonmoving] party to rebut that showing by producing affidavits or other relevant and *admissible*[2] evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (11th Cir. 2012) (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (emphasis added)). The nonmovant fails to "satisfy its burden if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Jones*, at 1292 (quoting *Anderson*, 477 U.S. at 249-50 (1986)). Moreover, a "mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the jury could reasonably find for [the nonmoving party]." *Walker v. Darby*, 911 F. 2d 1573, 1577 (11th Cir. 1990). Courts "are required to draw all reasonable inferences in favor of the nonmoving party, not all possible inferences." *Horn v. UPS*, 433 F. App'x. 788, 796 (11th Cir. 2011).

Under the Court's local rules, a party moving for summary judgment must attach to its motion "a separate and concise statement of the material facts to which the movant contends there is no genuine dispute to be tried." M.D. Ga. R. 56. Those facts must be supported by the record. The respondent to a summary judgment motion must respond

---

[2] Generally, "inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Jones*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted)). Nevertheless, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones*, 683 F.3d at 1293-94.

"to each of the movant's numbered material facts." *Id*. "All material facts contained in the *movant's* statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." *Id*.

## LEGAL AUTHORITY AND ANALYSIS

A.    Plaintiff's Race Discrimination Claims Under Title VII and § 1981

1.    **Plaintiff Failed to Establish a Prima Facie Case of Race Discrimination**

In the employment context, § 1981 provides for protection against discrimination based on race. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330-34 (11th Cir. 1998). Similarly, Title VII prohibits an employer from discharging or otherwise discriminating against a person based on his race. 42 U.S.C. § 2000e-2(a)(1). Therefore, courts analyze § 1981 claims using the same evidentiary requirements and analytical framework as claims brought under Title VII. *See Standard*, 161 F.3d 1318, 1330 (11th Cir. 1998). Disparate treatment claims can be proven using direct evidence (requiring no inference or presumption) or circumstantial evidence. *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). If racial discrimination claims are based on circumstantial evidence, then those claims are evaluated under the *McDonnell Douglas* burden shifting framework." *Id*.

Where, as here, a former employee attempts to prove discriminatory intent by circumstantial evidence,[3] the claims are subject to the methods of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Maynard v. Board of Regents of Div. of Universities of Florida Dept. of Educ. Ex rel. University of South Florida*, 342 F.3d 1281, 1289 (11th Cir. 2003). Under the *McDonnell Douglas* framework, a plaintiff establishes a prima facie case for disparate treatment in a race discrimination case by demonstrating that he (1) is a member of a protected class, (2) was qualified for his position, (3) suffered an adverse employment action, and (4) was replaced by someone outside of his protected class or was treated less favorably than a similarly situated[4] employee outside of his class. *Id*. If the plaintiff satisfies the four *McDonnell Douglas* elements, then the defendant must show a legitimate, nondiscriminatory reason for its employment action. *Burke-Fowler*, 447 F.3d at 1323; *McDonnell Douglas*, 411 U.S. 792, 802 (1973). If it does so, then the plaintiff

---

[3] Unlike circumstantial evidence, direct evidence of race discrimination is "evidence which, if believed, proves the existence of a fact without inference or presumption." *Scott v. Suncoast Beverage Sales, Ltd.*, F.3d 1223, 1227 (11th Cir. 2002). Further, "the Eleventh Circuit has stated, 'only the most blatant remarks, whose intent could be nothing other than to discriminate on the [protected classification]' are direct evidence of discrimination. *Id*. (quoting *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (alteration in original)). "Comments by non-decision makers or remarks unrelated to the decision making process are not direct evidence." *Standard*, 161 F.3d at 1330. "Under a 'cat's paw' theory, 'causation may be established if the plaintiff shows that the decision maker followed the biased recommendation [of the employee] without independently investigating the complaint against the employee.'" *Williams v. Cleaver-Brooks, Inc.*, No. 7:11-CV-144 (HL), 2012 WL 6151141, at *5 (M.D. Ga. Dec. 11, 2012) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (alteration in original)). In this case, Bond has not alleged that Tinsley, or any other member of upper management involved in his termination made any discriminatory comments. Accordingly, because Bond failed to offer any direct evidence of race discrimination, he must necessarily proceed under the circumstantial route.

[4] To be "similarly situated" to the plaintiff, another employee, known as a comparator, must be similarly situated "in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

must prove that the reason provided by the defendant is a pretext for unlawful discrimination. *Burke-Fowler*, 447 F.3d at 1323. To prove such a pretext (discussed in greater detail in Section 3 of this Order), the plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted).

In cases involving discriminatory discipline, courts ask "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Burke-Fowler*, 447 F.3d at 1323. The quantity and quality of the comparators' misconduct, moreover, must be "nearly identical" to that of the plaintiff "to prevent courts from second-guessing employers' reasonable decisions." *Id*. at 1323.

Thus, in order to satisfy the requirements of *McDonnell Douglas* in this case, Bond must establish that a Georgia Power "decision maker" observed (or by some other means learned of or knew) the alleged comparators, McAllister and Satcher, perform their work as poorly as Bond. In other words, if Bond can demonstrate that his manager, Webb, knew that McAllister and Satcher's work suffered from the same performance issues as Bond's and they did not receive the same reprimand, *then* Bond could establish a prima facie case of race discrimination.

First, it is undisputed between the parties that Bond is a member of a protected class. Second, Georgia Power hired Bond as a Truck Operator; thus, Bond clearly met and satisfied the qualifications necessary to secure employment. However, as to "suffering an adverse employment action," Bond believes his termination was an unjust and discriminatory action when compared to his two co-workers, McAllister and Satcher. *See Maynard*, 342 F.3d 1281, 1289 (11th Cir. 2003). Bond alleges that Satcher, as well as other seasoned employees, "had problems from barrelling [sic] rods." [Doc. 17, at 185:23–186:8]. While it is clear that Bond and other employees, whether newly hired or seasoned, occasionally "stumble" when assembling barrel rods, the comparators' overall misconduct is not "identical" to Bond's.[5] [*Id.* at 186:4]; *Burke-Fowler*, 447 F.3d at 1323, *supra*.

Contrary to Bond's assertion, Georgia Power did not terminate him because of the minor issues with Bond's job performance, i.e., that he might have on occasion unsuccessfully barreled rods, remembered tool names, retrieved the wrong tools, improperly tied certain knots, or struggled with knowledge retention and applying his classroom training while on the job. [Doc. 17, at 186:4; 101:18–102:1; 103:9-11]; *see also* [Doc. 15-3, at 149; ¶¶ 8, 9]. Rather, Bond's own deposition details an occasion where his

---

[5] Plaintiff offers no evidence, other than his own self-serving and unsubstantiated testimony, that other employees, even seasoned ones, struggled with similar tasks. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987) (holding "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment[]").

direct supervisor, Tinsley, suggested that he practice knot tying with a small piece of rope. [Doc. 17, at 103:2–104:22]; *see also* [Doc. 15-3, at 150; ¶ 10]. This shows that Bond's superiors wanted his job performance to improve so that Bond could continue his employ with Georgia Power.[6]

Instead, Bond's termination stemmed from his egregious actions on March 19, 2013. Since there is no evidence that either McAllister or Snatcher ever acted as dangerously or recklessly as Bond did during the incident on March 19, 2013, Bond's misconduct sets him apart from his fellow entry level Truck Operators. This significant distinction clearly shows that Bond and his fellow entry level Truck Operators were not accused of "the same or similar conduct." *See Burke-Fowler*, 447 F.3d at 1323. Consequently, Bond cannot show that Georgia Power treated him less favorably than a similarly situated employee outside of his protected class. Therefore, his race discrimination claim must fail as a matter of law.

### 2. Plaintiff Failed to Establish Disparate Treatment During Training

As for Bond's disparate treatment during training claim, his criticism was not his lack of qualification or ability to drive a commercial vehicle. Instead, Bond took issue with the fact that even though McAllister and Satcher held commercial driver's licenses, they were still nonetheless unqualified to drive these types of vehicles because they

---

[6] Tinsley "felt Mr. Bond was not putting in his full efforts at the Truck Operator position." [Doc. 15-3, at 150; ¶ 12.]

lacked the required training from Georgia Power (presumably, Smith's Defensive Driver Training). *Id*; *see also* [Doc. 17, at 129:15–130:10].

When asserting a claim for discriminatory denial of training, "a plaintiff must show (1) the plaintiff is a member of a protected class, (2) the defendant provided training to its employees, (3) the plaintiff was eligible for the training, and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination." *Gaines v. Johnson*, 44 F. Supp. 3d 1169, 1180 (N.D. Ala. 2014).

Here, it is undisputed that Bond is a member of a protected class and Georgia Power provides training to its employees to drive certain commercial vehicles. However, simply stated, Bond never received training on driving any of Georgia Power's commercial vehicles because he did not possess a commercial driver's license. [Doc. 17, at 130:15-22]. Thus, Bond was not eligible for training to drive a commercial vehicle.

Even assuming Georgia Power deviated from its policy by permitting commercial driver's license holders, McAllister and Satcher, to drive certain vehicles without taking specific training courses, this deviation does not raise an inference of discrimination. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1356 (11th Cir. 1999). Standing alone, absent a nexus between deviation and the employee's protected status, deviation from a company policy does not demonstrate discriminatory animus. *See id*. at 1356-57. "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v.*

*Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Alternatively, the inquiry is limited to "whether the employer gave an honest explanation of its behavior." *Id*.

Bond presents no evidence or makes any allegation that Georgia Power refused to allow Bond to drive certain commercial vehicles because of his race. [Doc. 17, at 131:2-5]. Georgia Power simply based its refusal to train Bond to drive a commercial vehicle on the fact that Bond did not possess a commercial driver's license. Therefore, Bond's ineligibility to train ends our inquiry on the issue of disparate treatment in training.

### 3.  Plaintiff Failed to Establish Pretext for Race Discrimination

Even if Bond established a claim for race discrimination, which he has not, under the *McDonnell Douglas* burden shifting framework, Georgia Power must show a legitimate, nondiscriminatory reason for its employment action. *Burke-Fowler*, 447 F.3d at 1323; *see also McDonnell Douglas*, 411 U.S. 792 (1973), *supra*.

> In a pretext analysis, when the quality of a plaintiff's work is at issue, the question is not whether the employer's opinion is incorrect or unfounded. Rather, the question is whether the employer is dissatisfied because of a nondiscriminatory reason, even if the reason is incorrect or unwise or whether the reason is merely a cover for discrimination.

*Redd v. United States Parcel Service, Inc.*, No. CV-12-BE-3986-S, 2012 WL 4792234, at *20 (N.D. Ala. Sep. 24, 2014) (*see Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)). A plaintiff's perception of his own performance and abilities is irrelevant since the inquiry into pretext "centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Margolis v. Public Health Trust of Miami-*

*Dade Cty.*, 89 F. Supp. 3d 1343, 1353-54 (S.D. Fla. 2015) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997)). "Ultimately, an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id*. at 1351. In order to show pretext, the plaintiff must show both that the employer's explanation was false, and that discrimination was the real reason for its decision. *Id*.

Bond's pivotal argument appears to be that he, in his own opinion, performed adequately in his job, and went "above and beyond" the duties expected of him as a Truck Operator. [Doc. 17, at 141:24–142:1]. However, as stated above, an employee's personal beliefs about his work performance are irrelevant. Other than Bond's own self-serving testimony that his job performance was adequate, the record is void of any evidence that his superior's observations and opinions (due to the supposedly false information they received from various co-workers[8]) on the issue of his work performance are false. However, in its motion for summary judgment, Georgia Power provided Task Observation Sheets demonstrating Bond's need for improvement as well as affidavits concerning Bond's work performance and managerial concerns about Bond. *See, e.g.*, [Doc. 15-3, at 143-146; 148-158]. These submissions are clear evidence of Georgia Power's

---

[8] "The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997). Therefore, any alleged comments (*infra*) made by Bond's co-workers who were not involved in the discussion between Tinsley and Webb that ultimately led to the decision to terminate are irrelevant and further fail to establish pretext.

dissatisfaction with Bond based on a nondiscriminatory reason. Therefore, Plaintiff's claims must fail.

Additionally, these records show a complete absence of race discrimination or any mention of Bond's race whatsoever. Specifically, the affidavits relating to the conversations between Tinsley and Webb, the two individuals ultimately responsible for Bond's termination, do not mention Bond's race. Moreover, "where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." *Holifield*, 115 F.3d at 1565. Therefore, given the absence of racial animus in Georgia Power's decision to terminate as well as Georgia Power's Task Observation Sheets and other supporting documentation, Bond fails to establish pretext to support his claim for racial discrimination.

### 4. Bond Failed to Establish a Racially Hostile Work Environment

Finally, Bond attempts to support a race discrimination claim on the basis that his co-workers' actions and comments created a hostile work environment. Title VII prohibits a hostile work environment in which "a series of separate acts . . . collectively constitute one unlawful employment practice." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008). "As opposed to discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire, a hostile work environment claim addresses acts

different in kind whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule, and insult." *Id.* (internal quotations omitted).

To establish a hostile work environment claim, a plaintiff must show that (1) he belongs to a protected group, (2) he has been subject to unwelcome harassment, (3) the harassment must have been based on a protected characteristic of the employee, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Id.* Determining whether the harassment was sufficiently severe or pervasive involves "both an objective and subjective component." *Id.* In determining the objective element, a court looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 116 (2002), *superseded in non-relevant part by statute, Lily Ledbetter Fair Pay Act of 2009*) (internal quotation and citation omitted).

Again, Bond's inclusion in a protected group is undisputed, and the comments to which Bond was allegedly susceptible were, no doubt, based on a "protected characteristic of the employee*." McCann*, 526 F.3d at 1378. In support of his hostile work environment claim, Bond alleges that his co-workers subjected him to a hostile work

environment when they made racial comments about his being black. To some effect, these comments were: that his race was the only reason for his hire; white employees have to work harder than Bond in order to keep their job; and finally, the comment or alleged verbal threat made by Chuck Raper during the March 19, 2013, incident.

As iterated above, the specifics of that incident involve Bond driving an ATV while pulling Lineman Raper in a transmission cart along a line. [Doc. 17, at 110:12–112:25]. When Bond crossed a creek at an accelerated and sudden rate of speed, the tension on the transmission gave way causing Raper to be pulled several feet down a transmission line, nearly throwing him from the cart. [*Id.* at 113:3–114:15]. Raper yelled at Bond in hopes that Bond would slow down, but Bond never heard Raper yelling at him. [*Id.* at 114:16-20]. When Bond told Raper that he did not hear him yelling, Raper replied, "[I]f [I] had had a gun [I] would have shot [you]." [Doc. 17, at 118:15–119:10].

Bond testifies that in the moments following the incident Tillman said, "[I]f [Bond] was pulling Mr. Raper that fast, [Tillman] would have thrown a wrench and hit [Bond] in the head." [*Id.* at 118:12-14]. When examining Tillman and Raper's comments—context is critical. As Georgia Power notes in its Reply [Doc. 19], "these statements were made in response to [Bond's] claim of not hearing Raper yelling at him after [Bond's] *actions* put Raper's safety at risk." [Doc. 19, at 4] (emphasis supplied).

Critically, there is no evidence that these two specific comments contain any mention of Bond's race or indicate that Raper or Tillman made these comments to or

about Bond because of his race. The racially-void comments surrounding the March 19, 2013, incident resulted from Bond putting Raper's safety at risk and were isolated statements, occurring in the heat of the moment following the incident involving the transmission cart. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (holding "mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee, [] does not sufficiently affect the conditions of employment to implicate Title VII."). Even though these statements might subjectively prompt offense, the circumstances and reasons for which they were spoken fail to give rise to the creation of a hostile work environment. Thus, these comments, as a matter of law, are insufficient to meet the necessary requirements of a hostile work environment claim.

As stated above, in order for a hostile work environment claim to succeed, "the harassment must have been based on a protected characteristic of the employee" and the harassment must be sufficiently severe or pervasive "to alter the terms and conditions of employment." *McCann*, 526 F.3d at 1378. Bond admits that DJ Ray's comment, when discussing the new hires, "two out of three is not bad" concerned Bond's work performance rather than his race. [Doc. 17, at 148:4-25].

However, the comments that involve racial implications such as the ones made by McAllister and Tillman require a more thorough analysis. The standard to be followed is whether the comments made to Bond constitute "severe or pervasive [behavior] to alter the terms and conditions of employment and create a discriminatorily abusive working

environment." *McCann*, 526 F.3d at 1378. Under the objective component, the main question in this case is whether the discriminatory conduct unreasonably interfered with Bond's *work performance*. *Id*. (emphasis added).

The specific comments under review include: McAllister's comments that "[H]e had to work ten times harder than [Bond] because [Bond is] black" [*Id*. at 143:23–144:2] and that "the company's not going to fire [Bond] because [he is] black" [Doc. 17, at 143:19-22], as well as the ones made by Tillman that "[T]he only reason you got hired is because you are black" [*Id*. at 143:15-18] and "[Y]ou act like a black Jimmy.[9]" [*Id*. at 146:19-20].

While Bond's response to Georgia Power's argument that summary judgment is inappropriate for the hostile work environment claim is conclusory and slim at best, the Court cannot ignore the evidence presented in making its determination. *See* [Doc. 18, at 19]. These comments span from Bond's hiring date of January 4, 2013, to his termination date of March 27, 2013. *See* [Doc. 17, at 32:4-8]. Thus, within a timeframe spanning nearly three months, Bond's co-workers subjected him to an average of more than one racial comment per month. However, for the reasons discussed below, summary judgment is still appropriate despite the frequency of the unnecessary comments (if actually said) made to Bond during his employ with Georgia Power.

---

[9] Jimmy is a white Georgia Power employee who, often times, is isolated from the crew. [Doc. 17, at 146:10-20].

Bond's claim for a hostile work environment fails for two reasons. First, when applying the above standard, the comments made by Bond's co-workers must be so severe or pervasive that they "alter" the terms and conditions of his employment or "unreasonably interfere" with Bond's work performance. *McCann*, 526 F.3d at 1378. There is no evidence that these alleged comments altered Bond's employment or work performance. In fact, Bond testified under oath that he performed his tasks "over and beyond" what was expected of him. [Doc. 17, at 150:4-14]. Thus, given these comments, it follows that Bond never alleged that his co-workers' comments affected his work performance. *See generally* [Doc. 17, at 142:14–151:9]. While these comments may have subjectively offended Bond, they clearly did not alter the terms and conditions of Bond's employment given that Bond himself considered his work product to be more than acceptable.

Second, Bond's claim for a hostile work environment also fails under the *Faragher-Ellerth* defense. "When a plaintiff alleges that h[is] employer is liable for the harassing conduct of co-workers instead of supervisors, the employer will be held liable only if it "knew or should have known of the harassing conduct but failed to take prompt remedial action." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1302 (11th Cir. 2007). To avoid liability for actions by its employees, Georgia Power must show that Bond "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Georgia Power] or to avoid harm otherwise." *See Faragher v. City of Boca*

*Raton*, 524 U.S. at 775, 807 (1998); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

This is precisely the case here—Bond "never complained to anyone at Georgia Power Company while [he was] employed about any of these comments other than the statements that [Tillman and Raper] said after the buggy incident."[10] [Doc. 17, at 149:5-12]. Since Bond failed to inform any direct supervisor or higher personnel at Georgia Power in an effort to remedy and eliminate any other potentially derogatory racial comments *Faragher* and *Ellerth* shields Georgia Power from liability.

In summation, because Bond presents no evidence that these comments "altered" the terms and conditions of employment and because he failed to take advantage of any preventive or corrective opportunities provided by Georgia Power, his claims must fail.[11]

---

[10] In response to Bond's complaint about Raper's comments, Georgia Power issued an Employee Discussion Guide. This report, although reduced to writing, was intended to be an "oral discussion." In that report, Bond received discipline for his gun comment and Georgia Power instructed that "Chuck must not make similar statements to his fellow employees in the future." [Doc. 19-1, at 2, 3].

[11] The Court takes this opportunity to respond to Defendant's representation of *McCann* to the Court. In its brief, Georgia Power makes the following statement: "First the alleged discriminatory comments by co-workers McAllister and Tillman are grossly inadequate to establish severe of pervasive behavior. *See McCann*, 526 F.3d 1370, 1378-79 (being called 'girl' and hearing a supervisor refer to a black employee as a 'ni**er' bitch' was not sufficiently severe or pervasive) . . ." [Doc. 15-1, at 15]. A fair reading of this statement would allow the reader to believe that Georgia Power is making the inference that McCann actually heard her supervisor make the racially derogatory comment. Further, to the extent Georgia Power attempts to persuade the Court that the Eleventh Circuit held that "a supervisor [referring] to a black employee as a 'ni**er bitch' [is] not sufficiently severe or pervasive" to create a hostile work environment, its argument, reading, and interpretation of *McCann* is woefully incorrect. [*Id.*]. In *McCann*, the Eleventh Circuit never indicated that the substance of defendant's "[ni–er] bitch" comment was not severe or pervasive. Any representation to the contrary would be a strongly misguided interpretation of that opinion. *McCann* clearly states, "[a]lthough McCann heard of racial epithets being spoken twice by Sheriff Tillman, these were never directed at McCann, nor spoken in her presence." 526 F.3d at 1379. The Eleventh Circuit affirmed the district court's grant of summary judgment, not on the severity of the language used by

For the foregoing reasons, Bond cannot, as a matter of law, prove pretext in order to establish a race discrimination claim pursuant to Title VII or a civil rights claim pursuant to 42 U.S.C. § 1981. Additionally, Bond's failure to inform Georgia Power of certain racially related comments that could potentially create a hostile work environment also precludes any claim. Given Bond's failure to rebut Georgia Power's showing that no dispute of material fact exists, his claims must fail as a matter of law. Thus, Georgia Power Company's Motion for Summary Judgment [Doc. 15] is hereby **GRANTED**. The Clerk is instructed to enter judgment in favor of Defendant Georgia Power Company.

     **SO ORDERED**, this 29th day of May, 2018.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

McCann's supervisor, but on the fact that the comments were never made about or to McCann or spoken within her hearing. *Id*. at 1378-79.